IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| LINDA M. WESTER, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 08-942-GMS |
| | ) | |
| MICHAEL J. ASTRUE,[1] | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM

## I. INTRODUCTION

This action arises from the denial of plaintiff Linda Wester's ("plaintiff") claim for

Social Security benefits. On November 30, 2005, plaintiff filed applications for Disability

Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") under Titles II

and XVI of the Social Security Act (the "Act"). (D.I. 15 at 51-83.) In her application and

disability report, plaintiff claimed she became disabled beginning on January 15, 1998,

due to panic attacks, agoraphobia, depression, post traumatic stress disorder ("PTSD"),

and suicidal thoughts. (*Id.* at 51, 85.) Following the Social Security Administration's

("SSA") denial of her claim, both initially and upon reconsideration, plaintiff requested

an ALJ hearing. (*Id.* at 31, 36-40, 42-48.) The hearing occurred on March 6, 2008. (*Id.*

at 26-28.) At the hearing, testimony was provided by plaintiff and an impartial

---

[1] Carolyn W. Colvin became the Commissioner of Social Security
("Commissioner") on February 13, 2013, after briefing began. Although under Federal
Rule of Civil Procedure 25, Carolyn W. Colvin should be substituted for Michael J.
Astrue, pursuant to 42 U.S.C. § 405(g), no further action is necessary to continue this
action.

vocational expert ("VE"), Christina Cody ("Cody"). (*Id.* at 537-65.) On April 2, 2008, the ALJ, Edward Banas, issued a written decision denying plaintiff's benefits claim. (*Id.* at 11-25.) Plaintiff requested a review of the ALJ's decision by the Social Security Appeals Council, which denied review on October 17, 2008. (*Id.* at 4-10.) On December 15, 2008, plaintiff filed a timely appeal with the court. (D.I. 2.) Presently before the court are the parties' cross-motions for summary judgment. (D.I. 17, 19.) For the reasons that follow, the court will: (1) deny plaintiff's motion for summary judgment, and (2) grant defendant's motion for summary judgment.

## II.    BACKGROUND

Plaintiff was born on October 16, 1954. (D.I. 15 at 51.) She has an Associate Degree in human services. (*Id.* at 542.) At the time of her application for DIB and SSI on November 19, 2005, plaintiff was fifty-one years old.[2] Her alleged disability dates back to January 15, 1998. (*Id.* at 51.) Throughout the duration in question, plaintiff worked as a part-time nursing assistant. (*Id.* at 86, 357.) From the date of her application for disability in 2005 through the date of the ALJ's decision, she worked as a food service worker, nursing home worker, file clerk, waitress, security guard, and housekeeper. (*Id.* at 237, 264, 334, 356-57, 360, 362, 426, 553.) Despite her prior vocational experience, plaintiff claims she remains disabled under the Act. (*Id.* at 51-83.) To be eligible for DIB and SSI, plaintiff must demonstrate she is disabled within the meaning of sections 216(I) and 223(d). (*Id.* at 14.)

---

[2]Pursuant to 20 C.F.R. § 404.1563(d), "[i]f you are closely approaching advanced age (age 50-54), we will consider that your age along with a severe impairment(s) and limited work experience may seriously affect your ability to adjust to other work."

2

### A.   Evidence Presented

Plaintiff claimed a history of mental health treatment for as long as she could remember, however, there is a significant lack of treatment evidence prior to 2005. (*Id.* at 263.)[3] Relevant documentation of her psychiatric impairments began on June 20, 2005, when she started treatment with New Castle County Community Mental Health Center ("CMH") for depression, anxiety, and PTSD. (*Id.* at 324-64.) Throughout her treatment with CMH, (from June 2005 to August 2006 comprising 20 visits), plaintiff's main concerns were financial, vocational and housing related. (*Id.* at 356.) During that time, she worked at a motel, as a temporary hospice worker, file clerk, housekeeper, and security guard. (*Id.* at 334, 356-57, 360, 362, 426.)

On September 15, 2005, CMH records indicate plaintiff's psycho-social situation deteriorated. (*Id.* at 355.) She quit her hospice job after the death of a client, because the death reminded her of a previous husband's passing in an automobile accident in 2000. (*Id.*) However, treatment records indicate the plaintiff was capable of gainful activity, and she wanted to work. (*Id.* at 326-27.)[4] On January 3, 2006, the plaintiff was assessed a Global Assessment of Functioning ("GAF") of 55. (*Id.* at 326-27.)[5]

---

[3] The record indicates plaintiff was briefly a patient with Delaware Health and Social Services, Division of Substance Abuse and Mental Health in 1995 and 2003, and was reportedly doing well by 2004. (*Id.* at 237, 261.) Attempts to obtain medical records from Rockford Center and Meadow Wood Hospital where unsuccessful. (*Id.* at 259, 260.)

[4] Plaintiff was actively seeking employment with Christiana Hospital, Wilmington Hospital and local nursing homes. (D.I. 15 at 356.)

[5] The GAF is a scale ranging from zero to one hundred used by mental health professions to express an adult's psychological, social and occupational functions. A GAF score of 61 to 70 indicates some mild symptoms or only some difficulty in social, occupational or educational functioning; a score of 51-60 indicates mild symptoms or moderate difficulty in social, occupational, or educational functioning; and a score of 41

On May 2, 2006, plaintiff underwent a consultative examination with Dr. Brian

Simon ("Simon"), a licensed psychologist with the Delaware Disability Service ("DDS").

(*Id.* 262-68.)[6]  Dr. Simon described plaintiff as having fair attention and concentration.

(*Id.* at 264.)  Her speech was normal in both rate and volume, but was tangential and

over-elaborative.  (*Id.*)  Dr. Simon noted plaintiff did not show any evidence of

articulation problems or slurring, hyperactivity or psychomotor retardation.  (*Id.*)  Her

immediate and short term memory was good, and she performed serial calculations

without errors.  (*Id.* at 265.)  Although she presented as being "a bit odd" and somewhat

nervous, plaintiff denied being suicidal, homicidal or significantly depressed.  (*Id.* at

265.)  Dr. Simon diagnosed PTSD, chronic generalized anxiety disorder, unspecific

personality disorder and a GAF of 50.  (*Id.* at 266.)

On the DDS psychological functional capacities evaluation form, Dr. Simon noted

plaintiff's degree of impairment in relating to others as moderately severe; however, her

restriction of daily activities and deterioration of personal habits were moderate, while

her constriction of interests were mild.[7]  (*Id.*)  Similarly, within the competitive labor-

---

to 50 suggests serious symptoms or serious impairment in social, occupational and
educational functioning.  AMERICAN PSYCHIATRIC ASS'N, DIAGNOSTIC & STATISTICAL
MANUAL OF MENTAL DISORDERS-TEXT REVISION 34 (4th ed. 2000).

   [6] DDS is a state administered federal program that serves Delawareans who are
unable to work because of a disability.  It is a state agency, governed by the Social
Security Administration and 100% federally funded.  DDS develops, adjudicates, and
processes disability claims for Social Security disability benefits and considers whether
a person meets the statutory definition of a disability under the Social Security Act and
whether the disabled individual meets medical eligibility to receive Social Security
Disability Insurance or Supplemental Security Income.  *See generally*
www.delawareworks.com/dvr/services/dds.shtml.

   [7] The DDS form defines "moderately severe" as "an impairment which seriously
affects ability to function;" "moderate" as "an impairment which affects but does not
preclude ability to function; and "mild" as "suspected impairment of slight importance
which does not affect ability to function."  (D.I. 15 at 268.)

4

market setting, Dr. Simon concluded her impairment in understanding simple, primarily oral, instructions was also mild. (*Id.* at 268.) Finally, he described plaintiff's impairment in carrying out instructions under ordinary supervision, sustaining work performance and attendance in a normal work-setting, coping with pressures of ordinary work, and performing routine, repetitive tasks under ordinary supervision as moderate. (*Id.*)

On June 29, 2006, a DDS psychologist completed a Psychiatric Review Technique and a Mental Residual Functional Capacity ("RFC") Assessment. (*Id.* at 296-309.) The psychiatric review described the following "B" Criteria limitations:[8] a mild restriction of daily living activities; moderate difficulties in social functioning and moderate problems with concentration, persistence, or pace; and one to two repeated episodes of decompensation of extended duration.[9] (*Id.* at 304.) The RFC assessed plaintiff was not significantly limited in most work-related activities, and was moderately limited as follows: maintaining attention and concentration for an extended period; performing activities within a schedule; maintaining regular attendance, and being punctual; completing a normal workday and workweek without interruption from psychologically based symptoms; performing at a consistent pace without an unreasonable number and length of rest periods; and accepting instructions and responding appropriately to criticism from supervisors. (*Id.* at 307-08.) In conclusion, the DDS psychologist found plaintiff was capable of low stress tasks, preferably away

---

[8] "B" Criteria functional limitations result from an individual's mental disorders and are found in paragraph B of listings 12.02-12.04, 12.06-12.08, and 12.10 and paragraph D of 12.05 of the regulations for evaluation of mental impairments. (D.I. 15 at 304; *see generally* 20 C.F.R. Pt. 404, Subpt. P, App. 1).

[9] None of the functional limitations listed met the "[d]egree of limitation that satisfies the functional criterion." (D.I. 15 at 304.)

5

from other co-workers. (*Id.* at 309.) On October 31, 2006, another DDS psychologist affirmed the June 29, 2006 report. (*Id.* at 368-81.)

In 2007, plaintiff relocated to North Carolina with her husband to pursue employment opportunities. (*Id.* at 388.) While there, she was treated at Wake County Human Services between January 26, 2007 and April 2, 2007.[10] (*Id.* at 403.) During the initial consultation on January 26, 2007, the mental status examiner described plaintiff as pleasant, cooperative, neatly groomed and goal oriented, with good eye contact, fair insight and intact judgement. (*Id.* at 389.) Her affect and mood were within normal limits. (*Id.*) Despite a diagnosis of PTSD, plaintiff was found capable of gainful employment. (*Id.* at 388, 393.) During a followup visit on April 2, 2007, plaintiff was alert, oriented, with a clear thought process and exhibited no delusions or psychotic symptomatology. (*Id.* at 399.) She denied auditory and visual hallucinations and had no suicidal or homicidal ideation. (*Id.*)

In June 2007, plaintiff returned to Delaware and began monthly treatment with Dr. Criselda Abad-Santos ("Dr. Abad-Santos"). (*Id.* at 410-25.) During the July 19. 2007 initial evaluation, Dr. Abad-Santos diagnosed major depressive disorder, recurrent, without psychotic features, PTSD, borderline personality disorder and a GAF of 45. (*Id.* at 425.)

On September 6, 2007, plaintiff was referred to Dr. Frederick Kurz ("Dr. Kurz") for psychological evaluation by the Division of Vocational Rehabilitation. (*Id.* at 426.) Diagnosis was cognitive disorder non-specific, generalized anxiety disorder and major

---

[10] Records indicate plaintiff rescheduled a May 29, 2007 appointment, and failed to show for a June 11, 2007 appointment.

depressive disorder. (*Id.* at 429.) Dr. Kurz found no evidence of personality or thought disorder, no reading disorder or conversational deficit. (*Id.*) He concluded plaintiff functioned "within low average to borderline levels of intelligence. Her reading abilities suggested that there had been a decline in her global intelligence. There were significant deficits noted in her short-term memory." (*Id.*) While Dr. Kurz found plaintiff was not sufficiently stable for competitive employment, he assessed a GAF score of 60. (*Id.* at 430.)

Plaintiff was evaluated by the Perspective Counseling Center on September 26, 2007. (*Id.* at 404.) Based on her subjective complaints, she was diagnosed with PTSD and had a GAF of 50. (*Id.* at 405.) The record includes two progress notes dated October, 9, 2007, and October 16, 2007, however, they contain no objective clinical findings. (*Id.* at 409.)

On November 10, 2007 after four consultations, Dr. Abad-Santos completed a mental residual functioning capacity form. (*Id.* at 410.) Her assessment concluded plaintiff was unable to meet competitive standards to perform even unskilled work, and assessed a GAF of 45. (*Id.* at 410-15.) During the treatment period with Dr. Abad-Santos, however, plaintiff worked as a housekeeper at Dover Downs, attended a work training program and responded well to treatment with signs of improvement. (*Id.* at 410, 417-18.)

Plaintiff is markedly obese, but no significant functioning limitations are attributed to her weight. According to Dr. Muhammed Niaz ("Dr. Niaz"),[11] plaintiff has no sensory,

---

[11] On July 31, 2006, Dr. Niaz performed a physical evaluation of plaintiff at the request of the SSA.

motor or reflex abnormalities. (*Id.* at 311.) She has no objective signs of joint pain, swelling, tenderness, inflammation, or respiratory problem, and has normal blood pressure. (*Id.*) Her gait was unremarkable, and she does not evidence any neurological or joint problems which could limit ambulation. (*Id.*) Dr. Niaz found plaintiff was capable of sustaining at least sedentary work for six to eight hours with customary breaks. (*Id.*) On August 19, 2006, after consultation and review of plaintiff's records, Dr. Robert Palandjian ("Dr. Palandjian") completed a physical residual functioning capacity assessment and determined plaintiff's "only physical restriction would be height and hazard precautions." (*Id.* at 321.) Dr. Palandjian found no exertional, manipulative, visual, or communicative limitations. (*Id.* at 317-320.)

Finally, plaintiff underwent a hysterectomy in December 2002, arthroscopic knee surgery in April 2000, removal of a nodule of the right lower lobe in March 2002, and was diagnosed with bronchitis and a mildly echogenic liver consistent with fatty infiltration in January 2006. (*Id.* at 177, 199, 232, 256-57.) She was hospitalized for eye and facial swelling in May 2006, and diagnosed with a kidney stone in November 2007. (*Id.* at 271, 431-36.)

### B.   Hearing Testimony

#### 1.   Plaintiff's Testimony

At the March 6, 2008 hearing, plaintiff testified about her background, the nature of her disability, and claim for benefits. (*Id.* at 540-58.) Specifically, she claimed a diagnosis of agoraphobia in 1985. (*Id.*) According to plaintiff, her situation began to deteriorate in 2005 while working as a home health aide, when a woman she cared for died. (*Id.* at 552.) The death was so upsetting plaintiff could no longer handle the

stresses of the job. (*Id.*) Plaintiff drives, but becomes nervous in heavy traffic. (*Id.* at 549.) Loud noises (emergency vehicles and overly crowded stores) cause panic attacks that may continue for an hour. (*Id.* at 556.)

Plaintiff also testified about her previous work experience including a recent twelve week placement at Goodwill through a vocational rehabilitation program. (*Id.*) While there, she worked as a sales representative five hours a day, three days a week and attended a weekly three hour training program. (*Id.* at 543.) Plaintiff spent most of her day reading, going outdoors and taking care of her dog. (*Id.* At 557.) She stated that through Goodwill and "book rehab," she hoped to find a part time job of five hours a day for up to twenty-five hours a week. (*Id.* at 558.)

### 2. The Vocational Expert's Testimony

Cody, the VE, testified about plaintiff's background, skills and limitations, and the number of jobs available in the national economy that a person of plaintiff's age, education, and skills may perform. (*Id.* at 558-64.) Specifically, she testified that plaintiff had past relevant work history as a home health aide and dietary aide at medium exertional levels, and as a housekeeper and waitress at light exertional levels.

The VE opined that depression would have a vocational impact by causing focusing issues, socializing problems and difficulty with complex reasoning tasks, and may require extended breaks and unscheduled loss of work time. (*Id.* at 560.) If loss of productivity reached the fifteen to twenty percent range, it would preclude employment. (*Id.*)

The ALJ posed several hypothetical situations to the VE. In each hypothetical, the individual was near the advanced age with a high school plus education and prior

9

work history similar to plaintiff. (*Id.* at 560-62.) In the first hypothetical, the individual had all the symptoms and limits complained by plaintiff, and for the second hypothetical, the individual was subject to all limits specified in Dr. Santos' report. (*Id.*) In both situations, the VE opined no jobs existed for such an individual. (*Id.*) In the third scenario, the VE was asked whether a hypothetical individual with the plaintiff's symptoms and past employment history–while on medication and in compliance with proscribed treatment, and in a low stress environment–would be capable of any employment. (*Id.* at 562.) In response, the VE testified that person could not perform plaintiff's past employment because those jobs required significant public contact, but other positions, such as a photo copy machine operator,[12] a collator,[13] and a mail room clerk were available.[14] (*Id.* 562-63.)

### C. The ALJ's Findings

Based on the factual evidence and the testimony of plaintiff and the VE, the ALJ determined plaintiff was not disabled and, therefore, ineligible for DIB or SSI. (*Id.* at 14-25.) The ALJ's findings are summarized as follows:

> 1. The claimant meets the insured status requirements of the Social Security Act through March 31, 2011.
>
> 2. The claimant has not engaged in substantial gainful activity since January 15, 1998, the alleged onset date (20 CFR 404.1520(b), 404.1571 *et seq.*).
>
> 3. The claimant has the following severe impairments: obesity, depression, and anxiety disorder (20 CFR 404.1520©).

---

[12] 3,600 regional positions, 194,600 nationally.
[13] 3,200 regional positions, 78,000 nationally.
[14] 24,000 regional positions, 459,000 nationally.

4. The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526).

5. [T]he claimant has the residual functional capacity to perform light exertional, unskilled work as defined in 20 CFR 404.1567(b) except limited to unskilled, simple, and routine without public contact, height and hazards.

6. The claimant is unable to perform any past relevant work (20 CFR 404.1565).

7. The claimant was born on October 16, 1954 and was 43 years old on the alleged disability onset date, and since has turned 50, defined as an individual approaching advanced age (20 CFR 404.1563).

8. The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564).

9. Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not claimant has transferable job skills (See SSR 82-41 and 30 CFR Part 404, Subpart P, Appendix 2).

10. Considering the claimant's age, education, work experience, and residual functioning capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.2560© and 404.1566).

(*Id.* at 16-25.)

## III.   STANDARD OF REVIEW

### A.   Motion For Summary Judgment

Both parties filed motions for summary judgment pursuant to Federal Rule of

Civil Procedure 56©.  In determining the appropriateness of summary judgment, the

court must "review the record as a whole, 'draw[ing] all reasonable inferences in favor of the non-moving party[,]' but [refraining from] weighing the evidence or making credibility determinations." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000) (citation omitted). If there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law, summary judgment is appropriate. *See Hill v. City of Scranton*, 411 F.3d 118, 125 (3d Cir. 2005) (quoting Fed. R. Civ. P. 56©).

This standard does not change merely because there are cross-motions for summary judgement. *Appelmans v. City of Philadelphia*, 826 F.2d 214, 216 (3d Cir. 1987). Cross-motions for summary judgment:

> are no more than a claim by each side that it alone is entitled to summary judgment, and the making of such inherently contradictory claims does not constitute an agreement that if one is rejected the other is necessarily justified or that the losing party waives judicial consideration and determination whether genuine issues of material fact exist.

*Rains v. Cascade Indus., Inc.*, 402 F.2d 241, 245 (3d Cir. 1968). "The filing of cross-motions for summary judgment does not require the court to grant summary judgement for either party." *Krupa v. New Castle County*, 732 F. Supp. 497, 505 (D. Del. 1990).

## B. Review Of The ALJ's Findings

Section 405(g) sets forth the standard of review of the ALJ's decision by the district court. The court may reverse the Commissioner's final determination only if the ALJ did not apply the proper legal standards, or the record did not include substantial evidence to support the ALJ's decision. The Commissioner's factual decisions are upheld if supported by substantial evidence. *See* 42 U.S.C. §§ 405(g), 1383(c)(3); *see also Monsour Med. Ctr. v. Heckle*, 806 F .2d 1185, 1190 (3d Cir. 1986). Substantial

12

evidence means less than a preponderance, but more than a mere scintilla of evidence. *Rutherford v. Barnhart*, 399 F.3d 546, 552 (3d Cir. 2005). As the United States Supreme Court has found, substantial evidence "does not mean a large or significant amount of evidence, but rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Pierce v. Underwood*, 487 U.S. 552, 565 (1988).

In determining whether substantial evidence supports the Commissioner's findings, the court may not undertake a *de novo* review of the Commissioner's decision nor re-weigh the evidence of record. *Monsour*, 806 F.2d at 1190. The court's review is limited to the evidence that was actually presented to the ALJ. *Matthews v. Apfel*, 239 F.3d 589, 593-95 (3d Cir. 2001). The Third Circuit has explained that a "single piece of evidence will not satisfy the substantiality test if the [Commissioner] ignores, or fails to resolve, a conflict created by countervailing evidence. Nor is evidence substantial if it is overwhelmed by other evidence, particularly certain types of evidence (e.g., evidence offered by treating physicians) or if it really constitutes not evidence but mere conclusion." *Kent v. Schweiker*, 710 F.2d 110, 114 (3d Cir. 1983). Thus, the inquiry is not whether the court would have made the same determination, but rather, whether the Commissioner's conclusion was reasonable. *Brown v. Bowen*, 845 F.2d 1211, 1213 (3d Cir. 1988). Even if the court would have decided the case differently, it must defer to the ALJ and affirm the Commissioner's decision so long as that decision is supported by substantial evidence. *Monsour*, 806 F .2d at 1190-91.

In an action in which review of an administrative determination is sought, the agency's decision cannot be affirmed on a ground other than that actually relied upon

13

by the agency in making its decision. *Hansford v. Astrue*, 805 F. Supp. 2d 140, 144-45 (W.D. Pa. 2011). In *Sec. & Exch. Comm'n v. Chenery Corp.*, the United States Supreme Court found that a "reviewing court, in dealing with a determination or judgment which an administrative agency alone is authorized to make, must judge the propriety of such action solely by the grounds invoked by the agency. 332 U.S. 194, 196 (1947). If those grounds are inadequate or improper, the court is powerless to affirm the administrative action by substituting what it considers to be a more adequate or proper basis." *(Id.)* The Third Circuit has recognized the applicability of this finding in the social security disability context. *Fargnoli v. Massanari*, 247 F.3d 34, 44, n.7 (3d Cir. 2001). Thus, this court's review is limited to the four corners of the ALJ's decision. *Cefalu v. Barnhart*, 387 F. Supp. 2d 486, 491 (W.D. Pa. 2005). In social security cases, this substantial evidence standard applies to motions for summary judgment brought pursuant to FED. R. CIV. P. 56©. *See Woody v. Sec'y. of the Dep't of Health & Human Serv.*, 859 F.2d 1156, 1159 (3d Cir. 1988).

## IV. DISCUSSION

### A. Parties' Contentions

In her appeal, plaintiff argues the ALJ did not have substantial evidence to support the denial of her application for DIB and SSI. (D.I. 18, 21.) Particularly, plaintiff argues the ALJ erroneously found she had the RFC to perform a significant range of light work, and relied on the VE's answers to a faulty hypothetical. (D.I. 18.) She further contends the ALJ erred in the amount of controlling weight given to the assessments of Drs. Abad-Santos and Kurz. *(Id.)* The Commissioner maintains the ALJ properly included all of plaintiff's medically established limitations in the RFC and

14

the hypothetical question posed to the VE. (D.I. 20.) Moreover, the Commissioner argues the ALJ was not required to give controlling weight to the assessments of Drs. Abad-Santos and Kurz. (Id.) As such, the Commissioner seeks a finding that the ALJ's decision was supported by substantial evidence. (Id.)

## B. Disability Analysis

Title II of the Social Security Act, 42 U.S.C. § 423(a)(l)(D), "provides for the payment of insurance benefits to persons who have contributed to the program and who suffer from a physical or mental disability." Bowen, 482 U.S. at 140. In order to qualify for DIB, the claimant must establish she was disabled prior to the date she was last insured. See 20 C.F.R. § 404.131. A "disability" is defined as the inability to do any substantial gainful activity because of any medically determinable physical or mental impairment, which either could result in death or has lasted or can be expected to last for a continuous period of at least 12 months. 42 U.S.C. §§ 423(d)(l)(A), 1382(c)(a)(3). To be disabled, the severity of the impairment must prevent return to previous work, and based on age, education, and work experience, restrict "any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 423(d)(2)(A); Barnhart v. Thomas, 540 U.S. 20, 21-22 (2003).

In determining whether a person is disabled, the Commissioner is required to perform a five-step sequential analysis. 20 C.F.R. § 404.1520; see also Plummer v. Apfel, 186 F.3d 422,427-28 (3d Cir. 1999). If a finding of disability or non-disability can be made at any point in the sequential process, the review ends. 20 C.F.R. § 404.1520(a)(4). At the first step, the Commissioner must determine whether the claimant is engaged in any substantial gainful activity, and if so, a finding of non-

disabled is required. 20 C.F.R. § 404.1520(a)(4)(I). If the claimant is not so engaged, step two requires the Commissioner to determine whether the claimant is suffering from a severe impairment or a combination of impairments that is severe. If no severe impairment or a combination thereof exists, a finding of non-disabled is required. 20 C.F.R. § 404.1520(a)(4)(ii).

If the claimant's impairments are severe, the Commissioner, at step three, compares the claimant's impairments to a list of impairments (the "listings") that are presumed severe enough to preclude any gainful work. 20 C.F.R. § 404.1520(a)(4)(iii); *see also Plummer*, 186 F.3d at 428. When a claimant's impairment or its equivalent matches an impairment in the listing, the claimant is presumed disabled. 20 C.F.R. § 404.1520(a)(4)(iii). If a claimant's impairment, either singularly or in combination, fails to meet or medically equal any listing, the analysis continues to steps four and five. 20 C.F.R. § 404.1520(e). At step four, the Commissioner determines whether the claimant retains the RFC to perform his past relevant work. 20 C.F.R.. § 404.1520(a)(4)(iv); *Plummer*, 186 F.3d at 428. A claimant's RFC is "that which an individual is still able to do despite the limitations caused by [her] impairment(s)." *Fargnoli*, 247 F.3d at 40. "The claimant bears the burden of demonstrating an inability to return to [her] past relevant work." *Plummer*, 186 F.3d at 428.

If the claimant is unable to return to her past relevant work, step five requires the Commissioner to determine whether the claimant's impairments preclude adjusting to any other available work. 20 C.F.R. § 404.1520(g); *see also Plummer*, 186 F.3d at 427-428. At this final step, the burden is on the Commissioner to show the claimant is capable of performing other available work existing in significant national numbers and

16

consistent with the claimant's medical impairments, age, education, past work experience and RFC before denying disability benefits. *Plummer*, 186 F.3d at 427-428. In making this determination, the ALJ must analyze the cumulative effect of all the claimant's impairments and often seeks the assistance of a vocational expert. *Id.*

### 1. The ALJ's RFC Determination

Plaintiff maintains the ALJ's RFC determination, particularly as it applies to her physical imitations, is not supported by substantial evidence. (D.I. 18, 21.) As mentioned above, an RFC assessment determines "the most [a claimant] can still do despite [her] limitations." 20 C.F.R. § 404.1545(a)(1). In making an RFC determination, all the relevant evidence must be considered. *Burnett v. Comm'r of Soc. Sec. Admin.*, 220 F.3d 112, 121 (3d Cir. 2000).

In the present case, the ALJ noted the sparse medical record prior to 2005. (D.I. 15 at 17.) While the ALJ recognized plaintiff suffered from obesity and past physical impairments, including knee and lung surgery, bronchitis, a kidney stone and a liver condition, he also found there were no significant functioning limitations attributed to them. (*Id.* at 23.) As the ALJ pointed out, "[t]he record indicates only limited and conservative treatment of her impairments" which did not go beyond limited routine maintenance, and "no significant increases or changes in prescribed medications reflective of an uncontrolled condition." (*Id.*) Additionally, the ALJ found plaintiff's activities of daily living and work history undermine the level of physical impairment alleged. (*Id.*) Finally, in reaching his decision, the ALJ referenced Dr. Niaz's consultative examination and report which found plaintiff capable of sustaining at least sedentary work for six to eight hours with customary breaks. (*Id.*) Based on these

considerations and explanations, the ALJ's conclusion is adequately supported by substantial evidence.

## 2. Weight Given to Treating Physician

Plaintiff asserts the ALJ erred by failing to give the opinions of Drs. Abad-Santos and Kurz controlling weight. (D.I. 18, 21.) "A cardinal principle guiding disability eligibility determinations is that the ALJ accord treating physicians' reports great weight." *Morales v. Apfel*, 225 F.3d 310, 317 (3d Cir. 2000). Such reports will be given controlling weight where a treating source's opinion on the nature and severity of a claimant's impairment is well supported by medically acceptable clinical and laboratory diagnostic techniques, and is not inconsistent with the other substantial evidence on record. *Fargnoli*, 247 F.3d at 43.

The ALJ must consider medical findings supporting the treating physician's opinion that the claimant is disabled. *Morales*, 225 F.3d at 317 (citing *Plummer*, 186 F.3d at 429). It is error, however, to apply controlling weight to an opinion merely because it comes from a treating source if it is not well-supported by the medical evidence, or inconsistent with other substantial evidence, medical or lay, in the record. SSR 96-2p. If the ALJ rejects the treating physician's assessment, he may not make "speculative inferences from medical reports," and may reject "a treating physician's opinion outright only on the basis of contradictory medical evidence." *Plummer*, 186 F.3d at 429. A statement by a treating source that a claimant is "disabled" is not a medical opinion: rather, it is an opinion on an issue reserved to the ALJ because it is a finding that is dispositive of the case. *See* 20 C.F.R. § 416.927 (e)(1). Only the ALJ can make a disability determination.

In this instance, the ALJ gave proper weight to the medical opinions and objective record evidence of Drs. Abad-Santos and Kurz. First, as the ALJ found, compared to the record as a whole, Dr. Abad-Santos' assessments were brief, conclusory, and inadequately supported by clinical findings. (D.I. 15 at 20.) He initially assessed a GAF of 45 based only upon plaintiff's subjective history, and as a result, determined she was unable to meet competitive standards or lacked all ability and aptitude to perform unskilled work. (D.I. 15 at 412.)

In determining the weight afforded to Dr. Abad-Santos' assessment, the ALJ noted the absence of supporting medical evidence and inconsistency with plaintiff's work history. (*Id.* at 19-20.) During her brief treatment with Dr. Abad-Santos,[15] she was employed as a housekeeper, completed a work training program, and improved with treatment. (*Id.* at 410, 417-18.) Based on the limited health care relationship, the lack of supporting documentary medical evidence, and inconsistencies with the record as a whole, including plaintiff's work history, substantial evidence exists to support the ALJ's finding that the record did not demonstrate the level of debilitation assessed by Dr. Abad-Santos. As a result, the ALJ was justified in affording minimal weight to Dr. Abad-Santos' opinion.

Similarly, the weight attributed to Dr. Kurz's finding was supported by substantial evidence. While Dr. Kruz noted plaintiff did not appear sufficiently stable for competitive employment, he assessed a GAF score of 60, indicating only moderate symptoms. (*Id.* at 430.) Unlike Dr. Abad-Santos' GAF assessment, the ALJ found Dr.

---

[15] The plaintiff's treatment history with Dr. Abad-Santos was limited to four visits. (D.I. 15 at 410-25.)

19

Kruz's assessment was based on a variety of clinical tests, and was consistent with the record.[16] (D.I. 15 at 20.) The ALJ did not err by giving more weight to Dr. Kruz's clinically supported GAF score, while rejecting his opinion on the plaintiff's ability to work. As mentioned previously, a treating source's finding of disability is a conclusion on an issue reserved solely to the ALJ. See 20 C.F.R. § 416.927(e)(1).

## 3. VE Hypothetical

Plaintiff raised several objections to the ALJ's conclusion at step 5, where he found she retained the limited functional capacity to perform existing jobs. (D.I. 18, 21.) The ALJ's conclusion was based in part on testimony by the VE. (D.I. 15 at 25.) Plaintiff claims, such testimony cannot form the basis of substantial evidence because the hypotheticals failed to adequately consider all her limitations. (D.I. 18, 21.) In Podedworny v. Harris, the Third Circuit held:

Testimony of vocational experts in disability determination proceedings typically includes, and often centers upon, one or more hypothetical questions posed by the ALJ to the vocational expert. The ALJ will normally ask the expert whether, given certain assumptions about the claimant's physical capability, the claimant can perform certain types of jobs, and the extent to which such jobs exist in the national economy. While the ALJ may proffer a variety of assumptions to the expert, the vocational expert's testimony concerning a claimant's ability to perform alternative employment may only be considered for purposes of determining disability if the question accurately portrays the claimant's individual physical and mental impairments. Thus, the expert must have evaluated claimant's particular impairments as contained in the record.

5 F.2d 210, 218 (3d Cir. 1984).

---

[16] Tests include the WASI and Wechsler Test of Adult Reading, which focus on intellectual and academic functioning; Hopkins Verbal Learning Test-Revised, which examines memory; Brief Test of Attention, which determines attention; BDI, which evaluates mood; and Self-Directed Search-Form E, which considers vocational interest. (D.I. 15 at 426-30.)

The ALJ, however, is not required to include in the hypothetical posed to the VE

every impairment alleged by a claimant; rather, the ALJ need only accurately convey to

the VE those limitations which have been credibly established. *See Rutherford*, 399

F.3d at 554.

> Objections to the adequacy of hypothetical questions posed to a
> vocational expert often boil down to attacks on the RFC assessment itself.
> That is, a claimant can frame a challenge to an ALJ's reliance on
> vocational expert testimony at step 5 in one of two ways: (1) that the
> testimony cannot be relied upon because the ALJ failed to convey
> limitations to the vocational expert that were properly identified in the RFC
> assessment, or (2) that the testimony cannot be relied upon because the
> ALJ failed to recognize credibly established limitations during the RFC
> assessment and so did not convey those limitations to the vocational
> expert. Challenges of the latter variety [as in the instant matter] are really
> best understood as challenges to the RFC assessment itself."

*Rutherford*, 399 F.3d at 554.

The ALJ is not required to credit VE testimony in response to a hypothetical

question that includes limitations the ALJ finds not credible. *Craigie v. Bowen*, 835 F.2d

56, 57-58 (3d Cir. 1987).

A limitation which is medically supported and otherwise uncontradicted in the record,

must be included in a hypothetical question posed to a VE, or the ALJ's reliance on the

response will be in error. *Burns v. Barnhart*, 312 F.3d 113, 123 (3d Cir 2002).

Additionally, the ALJ may not substitute his own expertise to refute such record

evidence. *Plummer*, 186 F.3d at 429. Limitations that are medically supported, but are

also contradicted by other evidence in the record may or may not be found

credible—the ALJ can choose to credit portions of the existing evidence but "cannot

reject evidence for no reason or for the wrong reason." *Mason v. Shalala*, 994 F.2d

1058, 1066 (3d Cir. 1993); Reg. § 929(c)(4)).

21

Here, the ALJ found plaintiff had mild restrictions in activities of daily living; moderate difficulties in social functioning, concentration, persistence or pace with the potential for one to two episodes of decompensation. (D.I. 15 at 21.) Plaintiff argues these limitations were not adequately accounted for in any of the ALJ's hypotheticals to the VE. (D.I. 18, 21.) The ALJ's third hypothetical question to the VE included the following limitations, "[a]ny jobs that hypothetical individual might be able to do would have to be just simple, routine in nature, would not involve more than average work stresses beyond – and would not involve working with other people, would be working with things rather than people." (D.I. 15 at 561-62.) Plaintiff's argument is without merit. Initially, the hypothetical individual was limited to receiving only simple directions routine in nature, which accounts for mild restrictions of daily living and moderate difficulties in concentration. (*Id.*) The ALJ's hypothetical individual would not be working with other people, which encompasses moderate difficulties in social functioning and other related issues. (*Id.*) Finally, the hypothetical individual would not encounter more than average work stress, which accounts for any persistence, pace, and decompensation concerns. (*Id.*) The ALJ, therefore posed a proper hypothetical to the VE which accounted for all of plaintiff's credibly established limitations.

With due consideration given to the parties arguments and submissions, and the applicable law, the court finds that the ALJ's disability determination was properly supported by substantial evidence.

## V.    CONCLUSION

For the aforementioned reasons, the court concludes that the ALJ's denial of DIB

and SSI is based on substantial evidence, and accordingly, will deny Wester's motion

for summary judgment and grant the Commissioner's motion for summary judgment.

Dated May 28, 2014

CHIEF, UNITED STATES DISTRICT JUDGE

23

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

LINDA M. WESTER,                         )
                                         )
          Plaintiff,                     )
                                         )
     v.                                  )     Civil Action No. 08-942-GMS
                                         )
MICHAEL J. ASTRUE,                       )
Commissioner of Social Security,         )
                                         )
          Defendant.                     )

## ORDER

For reasons set forth in the Memorandum issued on this date,

**IT IS HEREBY ORDERED** this 28th day of May, 2014, that

1.   Plaintiff's motion for summary judgment (D.I. 17) is DENIED;

2.   Defendant's motion for summary judgment (D.I. 19) is GRANTED; and

3.   The decision of the ALJ is affirmed.

CHIEF, UNITED STATES DISTRICT JUDGE

24